1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT

9                     EASTERN DISTRICT OF CALIFORNIA

10

11   JAMES STEWART, individually and as            No. 2:19-cv-01744-TLN-DB
     successor in interest to decedent JAHMAL
12   DERRICK STEWART,

13                  Plaintiff,                      **ORDER**

14        v.

15   COUNTY OF YUBA, a municipal
     corporation; TAMARA PECSI,
16   individually and in her official capacity as
     a deputy sheriff for the Yuba County
17   Sheriff's Department; SCOTT
     JOHANNES, individually and in his
18   official capacity as a deputy sheriff for the
     Yuba County Sheriff's Department; and
19   DOES 1–50, inclusive, individually and in
     their official capacity as agents for Yuba
20   County Sheriff's Department,

21                  Defendants.

22

23        This matter is before the Court on Defendants County of Yuba ("County"), Tamara Pecsi

24   ("Sergeant Pecsi"), and Scott Johannes's ("Deputy Johannes") (collectively, "Defendants")

25   Motion for Summary Judgment.  (ECF No. 32.)  Plaintiff James Stewart ("Plaintiff"),

26   individually and as successor in interest to decedent Jahmal Derrick Stewart ("Mr. Stewart"),

27   filed an opposition.  (ECF No. 33.)  Defendants filed a reply.  (ECF No. 35.)  For the reasons

28   stated herein, Defendants' motion is GRANTED in part and DENIED in part.

                                              1

1    **I.      FACTUAL AND PROCEDURAL BACKGROUND**[1]

2    On January 14, 2019, Helen Miller noticed a suspicious male walking around the mobile

3    home park where she lived.  (ECF No. 33-2 at 2.)  Ms. Miller told David Turner, another resident

4    of the mobile home park, about the man walking around.  (*Id.* at 3.)  The man walking around was

5    later identified as Mr. Stewart.  (*Id.*)  Thereafter, Mr. Turner began searching the mobile home

6    park for Mr. Stewart.  (*Id.*)  When Mr. Turner found Mr. Stewart, he asked if Mr. Stewart needed

7    help.  (*Id.*)  Mr. Stewart then grabbed Mr. Turner by the throat for between five and ten seconds

8    and held Mr. Turner down in the seat of a golf cart and tried to punch Mr. Turner.  (*Id.*)  A young

9    man intervened, and Mr. Stewart began leaving the mobile home park.  (*Id.* at 4.)

10    About 30 to 45 seconds after the altercation, Mr. Turner drove his golf cart to check on the

11    young man who intervened and Mr. Turner saw Mr. Stewart across the street.  (*Id.*)  Mr. Stewart

12    then turned around and began running at Mr. Turner.  (*Id.*)  Billy Gardner, who was driving his

13    vehicle along North Beale Road, saw Mr. Stewart raise his fists as he moved toward Mr. Turner.

14    (*Id.* at 5.)  Mr. Turner attempted to swing his cane at Mr. Stewart, but Mr. Turner fell.  (*Id.*)  Mr.

15    Stewart then began attacking Mr. Turner by punching and kicking him on the ground.  (*Id.*)  After

16    the assault ended, Mr. Stewart left the mobile home park again and crossed the street onto North

17    Beale Road.  (*Id.* at 6.)

18    At 3:33:45, a 911 call was placed to the Yuba County Sheriff's Office regarding Mr.

19    Stewart hitting Mr. Turner.  (*Id.* at 7.)  The caller reported Mr. Stewart was wearing a sweater and

20    leaving eastbound on North Beale Road.  (*Id.*)  At 3:33:52, Deputy Johannes was dispatched to

21    the assault, and he was assigned as primary to the call for service along North Beale Road.  (*Id.*)

22    Deputy Johannes arrived first and believed the man he saw walking matched the description of

23    the suspect provided by dispatch.  (*Id.* at 8.)

24    Meanwhile, Sergeant Pecsi was patrolling Linda, California around Yuba County as the

25    patrol supervisor.  (*Id.* at 9.)  She heard a call for service regarding an assault on an elderly man

26    on North Beale Road and heard Deputy Johannes respond as the primary.  (*Id.*)  Sergeant Pecsi

27    _____

28    [1]      Except as otherwise noted, the facts in this section are undisputed.

1    also responded because she was nearby and able to respond to the call.  (*Id.* at 10.)

2         At 3:36:46, Deputy Johannes arrived at the scene and located Mr. Stewart walking along

3    North Beale Road.  (*Id.* at 11.)  Deputy Johannes parked his patrol vehicle along the curb, got out

4    of the vehicle, and told Mr. Stewart to stop walking and that he needed to speak with him.  (*Id.* at

5    11–12.)  Deputy Johannes commanded Mr. Stewart to show his hands, which Mr. Stewart did

6    after multiple commands.  (*Id.* at 12.)  Deputy Johannes then began to conduct a pat-down search

7    on Mr. Stewart.  (*Id.*)

8         At that point, Mr. Stewart said "no" and began to actively resist by pulling away and

9    running toward Deputy Johannes's patrol vehicle.  (*Id.* at 13.)  Deputy Johannes grabbed Mr.

10   Stewart, and Mr. Stewart spun around and placed his hand on Deputy Johannes's gun and holster.

11   (*Id.*)  Deputy Johannes immediately "capped his gun" by using his palm on the gun to keep it in

12   the holster.  (*Id.*)  Witness Scott Lawrence was standing five to six feet away and saw Mr. Stewart

13   trying to get Deputy Johannes's gun out of its holster.  (*Id.*)

14        Deputy Johannes hooked Mr. Stewart's right arm and used a leg sweep to bring Mr.

15   Stewart to the ground, where they both struggled for control of the gun.  (*Id.* at 14.)  While the

16   struggle continued on the ground, Deputy Johannes radioed for assistance.  (*Id.*)  Deputy

17   Johannes commanded Mr. Stewart to stop resisting.  (*Id.*)  Deputy Johannes also radioed that Mr.

18   Stewart had his hand on Deputy Johannes's gun and screamed and yelled that Mr. Stewart was

19   taking his gun.[2]  (ECF No. 33-2 at 15.)  Deputy Johannes felt he was getting overpowered by Mr.

20   Stewart because he could not get Mr. Stewart's hand away from the gun.  (*Id.*)

21        Less than a minute after Deputy Johannes and Mr. Stewart began fighting on the ground,

22   Sergeant Pecsi arrived.  (*Id.* at 16.)  As she drove closer to Deputy Johannes and Mr. Stewart, she

23   saw Mr. Stewart on top of Deputy Johannes in the grass next to the sidewalk.  (*Id.*)  Sergeant

24   Pecsi then advised dispatch to send additional units.  (*Id.*)  It took approximately ten seconds from

25   _____

26   [2]      Plaintiff attempts to dispute this fact by arguing that although Mr. Stewart never removed
     Deputy Johannes's gun from its holster, Deputy Johannes screamed Mr. Stewart had his gun.

27   (ECF No. 33-2 at 15.)  However, this fact remains undisputed because Plaintiff does not dispute
     Deputy Johannes both radioed that Mr. Stewart had his hand on Deputy Johannes's gun and

28   screamed and yelled that Mr. Stewart was taking his gun.  (*Id.*)

the time Sergeant Pecsi first witnessed the fighting to stopping her patrol vehicle nearby.  (*Id.*) Sergeant Pecsi parked her vehicle near the location of the fight and immediately exited the vehicle and ran to separate Mr. Stewart and Deputy Johannes.  (*Id.* at 16–17.)  At this point, Sergeant Pecsi did not have her gun drawn.  (*Id.* at 17.)  Mr. Gardner heard Sergeant Pecsi issue commands to Mr. Stewart to stop.  (*Id.*)

Within seconds of getting out of her vehicle, Sergeant Pecsi heard Deputy Johannes scream in person and over the radio that Mr. Stewart had Deputy Johannes's gun.  (*Id.*) Immediately after hearing Deputy Johannes yell that Mr. Stewart had his gun, Sergeant Pecsi heard a gunshot from underneath Mr. Stewart and where Deputy Johannes was located as Mr. Stewart had discharged Deputy Johannes's gun.[3]  (*Id.* at 17–18.)  At that time, Mr. Stewart was on top of Deputy Johannes in body-to-body contact and Sergeant Pecsi was approximately eight to twelve yards away.  (*Id.* at 18.)  Sergeant Pecsi believed Mr. Stewart was in possession of Deputy Johannes's gun, but she did not see Mr. Stewart aiming or holding a gun at any point. (*Id.*; ECF No. 35-1 at 7.)  According to Deputy Johannes, Mr. Stewart was able to partially remove the gun from its holster to access the trigger and fire it.  (ECF No. 33-2 at 18.)

Sergeant Pecsi believed Mr. Stewart shot Deputy Johannes and she saw Deputy Johannes begin rolling away, grabbing his stomach, and acting like he had been shot.  (*Id.* at 19.)  Without giving any verbal commands, Sergeant Pecsi fired four shots in quick succession at Mr. Stewart. (*Id.*; ECF No. 35-1 at 7–8.)  At the time Sergeant Pecsi fired her gun, Deputy Johannes and Mr. Stewart were still touching and on the ground, but Deputy Johannes was beginning to roll and separate.[4]  (ECF No. 33-2 at 20.)  The CAD radio traffic logged approximately six seconds

---

[3]   As discussed *supra*, while Plaintiff does not dispute this fact, there is conflicting evidence in the record about whether this gunshot occurred.  The Court observes this conflict pursuant to its duty to "carefully examine all the evidence in the record" in cases of an officer's use of deadly force.  *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014).

[4]   As discussed *supra*, while Plaintiff does not dispute this fact, there is conflicting evidence in the record about whether Deputy Johannes and Mr. Stewart were touching and on the ground when Sergeant Pecsi fired her gun.  The Court observes this conflict pursuant to its duty to "carefully examine all the evidence in the record" in cases of an officer's use of deadly force. *Cruz*, 765 F.3d at 1079.

1  between Deputy Johannes's statement that Mr. Stewart had his gun to Sergeant Pecsi reporting

2  shots fired.  (*Id.*)  Sergeant Pecsi immediately broadcasted 1199 — officer down.  (*Id.*)  After

3  firing her gun, Sergeant Pecsi ordered Mr. Stewart to show his hands.  (*Id.*)  Mr. Stewart then

4  attempted to stand up, but then collapsed onto his back on the ground.  (ECF No. 35-1 at 8.)

5        Sergeant Pecsi requested two ambulances for Deputy Johannes and Mr. Stewart.  (ECF

6  No. 33-2 at 21.)  Sergeant Pecsi noticed Deputy Johannes's gun partially coming out of the back

7  of the holster and the slide was slightly back, and when the slide was pulled back smoke came out

8  of the chamber.  (*Id.*)  This gun malfunction can occur when someone is loosely gripping the gun.

9  (*Id.*)

10        Dr. Kelly Kobylanski completed the autopsy of Mr. Stewart on January 17, 2019.  (*Id.* at

11  22.)  Dr. Kobylanski concluded Mr. Stewart received four gunshot wounds to his abdomen, right

12  arm, superiormost wound to the back, and an inferiormost wound to the back.  (*Id.*)  Dr.

13  Kobylanski also concluded Mr. Stewart's cause of death was multiple gunshot wounds.  (*Id.* at

14  22–23.)

15        On September 3, 2019, Plaintiff filed the instant action.  (ECF No. 1.)  On November 16,

16  2020, Plaintiff filed a Second Amended Complaint ("SAC").  (ECF No. 19.)  Plaintiff's SAC

17  alleges seven causes of action: (1) excessive force against Sergeant Pecsi and Deputy Johannes;

18  (2) denial of medical care against Sergeant Pecsi and Deputy Johannes; (3) violation of Plaintiff's

19  Fourteenth Amendment right to familial relationship against Sergeant Pecsi and Deputy Johannes;

20  (4) municipal liability under *Monell* against the County[5]; (5) wrongful death-negligence against

21  Sergeant Pecsi and Deputy Johannes; (6) violation of California Civil Code § 52.1 against

22  Sergeant Pecsi and Deputy Johannes; and (7) battery against Sergeant Pecsi.  (ECF No. 19.)  On

23  May 14, 2021, Defendants filed the instant motion for summary judgment.  (ECF No. 32.)  On

24  June 10, 2021, Plaintiff filed an opposition.  (ECF No. 33.)  On June 17, 2021, Defendants filed a

25  reply.  (ECF No. 35.)

26      **II.**    S<small>TANDARD OF</small> L<small>AW</small>

27  ───────────────

28  [5]      Plaintiff's fourth claim takes its name from the Supreme Court's opinion in *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978).

Summary judgment is appropriate when the moving party demonstrates no genuine issue of any material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file."  *Id.* at 324 (internal quotation marks omitted).  Indeed, summary judgment should be entered against a party who does not make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(c).  The opposing party must demonstrate that the fact in contention is material, *i.e.*, a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.* at 251–52.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *First Nat'l Bank of Ariz.*, 391 U.S. at 288–89.  Thus, the "purpose of summary judgment is

1    to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

2    trial.'"  *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's

3    note on 1963 amendments).

4              In resolving the summary judgment motion, the court examines the pleadings, depositions,

5    answers to interrogatories, and admissions on file, together with any applicable affidavits.  Fed.

6    R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982).  The evidence

7    of the opposing party is to be believed and all reasonable inferences that may be drawn from the

8    facts pleaded before the court must be drawn in favor of the opposing party.  *Anderson*, 477 U.S.

9    at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

10   obligation to produce a factual predicate from which the inference may be drawn.  *Richards v.*

11   *Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir.

12   1987).  Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party

13   "must do more than simply show that there is some metaphysical doubt as to the material facts."

14   *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  "Where the record taken as a whole could not lead

15   a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Id.* at

16   587.

17        **III.   ANALYSIS**

18             Defendants move for summary judgment on all of Plaintiff's claims based on several

19   grounds.  (ECF No. 32.)  In opposition, Plaintiff asserts summary judgment should be denied on

20   his claims, but he does not address his second claim for denial of medical care or his fourth claim

21   for municipal liability under *Monell*.  (*See* ECF No. 33.)  The Court will address the parties'

22   arguments in turn.

23   ///

24             A.      Evidentiary Objections

25             As a preliminary matter, the Court will address Plaintiff's evidentiary objections to

26   Defendants' separate statement of undisputed facts.  (ECF No. 33-2.)  Plaintiff objects to over 85

27   of Defendants' proffered facts.  (*Id.*)  The stated grounds for Plaintiff's objections are: (1) vague

28   and ambiguous as phrased; and (2) immaterial and irrelevant.  (*Id.*)

7

"Objections to evidence on the ground that the evidence is irrelevant . . . [or] vague and ambiguous . . . are all duplicative of the summary judgment standard itself." *Carden v. Chenega Sec. & Prot. Servs., LLC*, No. 2:09-cv-01799-WBS-CMK, 2011 WL 1807384, at *3 (E.D. Cal. May 10, 2011); *see also Kaur v. City of Lodi*, 263 F. Supp. 3d 947, 954 (E.D. Cal. 2017); *Bd. of Trustees of Cal. Winery Workers' Pension Tr. Fund v. Giumarra Vineyards*, No. 1:17-cv-00364-SAB, 2018 WL 1155988, at *3 (E.D. Cal. Mar. 2, 2018) (noting immateriality objections are inapplicable on summary judgment). "Objections on any of these grounds are superfluous[.]" *Carden*, 2011 WL 1807384, at *3. Therefore, the Court need not and does not separately address Plaintiff's instant objections.

### B.      Claim One: Excessive Force

Defendants argue summary judgment is appropriate on Plaintiff's first claim because Sergeant Pecsi and Deputy Johannes's actions were objectively reasonable under the totality of the circumstances. (ECF No. 32-1 at 14.) Defendants also assert Sergeant Pecsi and Deputy Johannes are entitled to qualified immunity. (*Id.* at 19.) In opposition, Plaintiff argues Sergeant Pecsi used unreasonable force. (ECF No. 33 at 9.) Plaintiff also contends Deputy Johannes was an integral participant in the use of unreasonable force and qualified immunity does not apply. (*Id.* at 12.)

Plaintiff brings his first claim pursuant to 42 U.S.C. § 1983. (ECF No. 19 at 8.) Section 1983 provides that "[e]very person who, under color of any [state law], subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured[.]" 42 U.S.C. § 1983. "Section 1983 does not create any substantive rights, but is instead a vehicle by which plaintiffs can bring federal constitutional and statutory challenges to actions by state and local officials." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006).

Here, Plaintiff claims Sergeant Pecsi and Deputy Johannes used excessive force against Mr. Stewart in violation of the Fourth Amendment. (ECF No. 19 at 8.) A Fourth Amendment claim of excessive force is analyzed under the framework set forth in *Graham v. Connor*, 490 U.S. 386 (1989). Under *Graham*, the Court must balance "the nature and quality of the intrusion

1    on the individual's Fourth Amendment interests against the countervailing governmental interests

2    at stake." *Id.* at 396.  "The 'reasonableness' of a particular use of force must be judged from the

3    perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

4    *Id.*

5           The reasonableness of an officer's use of force is examined in a three-step analysis.

6    *Glenn v. Washington Cty.*, 673 F.3d 864, 871 (9th Cir. 2011).  The first step is "assess[ing] the

7    severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and

8    amount of force inflicted."  *Id.*  The second step is "evaluat[ing] the government's interest in the

9    use of force."  *Id.*  The third step is "balanc[ing] the gravity of the intrusion on the individual

10   against the government's need for that intrusion."  *Id.*

11          The Ninth Circuit has held summary judgment in excessive force cases should be granted

12   sparingly.  *Id.*  The Ninth Circuit has also noted "[d]eadly force cases can pose a particularly

13   difficult problem . . . because the officer defendant is often the only surviving eyewitness."

14   *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014) (en banc).  "Therefore, the judge

15   must ensure that the officer is not taking advantage of the fact that the witness most likely to

16   contradict his story — the person shot dead — is unable to testify."  *Scott v. Henrich*, 39 F.3d

17   912, 915 (9th Cir. 1994); *see also Cruz*, 765 F.3d at 1079.  "[T]he judge must carefully examine

18   all the evidence in the record . . . to determine whether the officer's story is internally consistent

19   and consistent with other known facts."  *Cruz*, 765 F.3d at 1079 (quoting *Scott*, 39 F.3d at 915).

20   Thus, a court "must also look at the circumstantial evidence that, if believed, would tend to

21   discredit the police officer's story, and consider whether this evidence could convince a rational

22   factfinder that the officer acted unreasonably."  *Scott*, 39 F.3d at 915.

23   ///

24          The Court begins by assessing the severity of the intrusion on Mr. Stewart's Fourth

25   Amendment rights before evaluating the government's interest in the use of force and then

26   balancing the intrusion against the government's need for the intrusion.  Following this analysis,

27   the Court will address the parties' arguments regarding Deputy Johannes's participation and the

28   assertion of qualified immunity.

1    *i.*        *Severity of the Intrusion*

2    The parties do not dispute the severity of Sergeant Pecsi's use of force against Mr.

3    Stewart.  (*See* ECF No. 32-1 at 16; ECF No. 33 at 10.)

4    Sergeant Pecsi used deadly force when she shot Mr. Stewart.  *See Tan Lam v. City of Los*

5    *Banos*, 976 F.3d 986, 997 (9th Cir. 2020).  "The Supreme Court has recognized that '[t]he

6    intrusiveness of a seizure by means of deadly force is unmatched.'"  *Id.* at 998 (quoting

7    *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)).  Accordingly, Sergeant Pecsi's use of deadly force

8    against Mr. Stewart was the "most severe intrusion on his Fourth Amendment rights."  *Id.*

9    *ii.*       *The Government's Interest*

10    Courts assess the importance of the government's interest in the use of force by

11    evaluating: "(1) the severity of the crime at issue[;] (2) whether the suspect posed an immediate

12    threat to the safety of the officers or others[;] and (3) whether the suspect was actively resisting

13    arrest or attempting to evade arrest by flight."[6]  *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir.

14    2003) (citing *Graham*, 490 U.S. at 396).  The most important factor is whether the suspect posed

15    an immediate threat to the safety of the officer or another.  *Tan Lam*, 976 F.3d at 998.  The Court

16    examines each of these factors in turn.

17    ///

18    ///

19    a.        Severity of the Crime

20    Defendants argue Sergeant Pecsi and Deputy Johannes were confronted with a severe

21    crime because Deputy Johannes suspected Mr. Stewart assaulted Mr. Turner and Mr. Stewart

22    fought and struggled with Deputy Johannes on the ground, including Mr. Stewart reaching for

23    and grabbing Deputy Johannes's gun.  (ECF No. 32-1 at 16.)  Plaintiff asserts the underlying

24

25    [6]        The Ninth Circuit has recognized these factors are non-exclusive, and courts are to
consider the totality of the circumstances.  *Gonzalez*, 747 F.3d at 793–94.  Other factors the Ninth
26    Circuit has examined include whether the officer gave a warning, if practicable, before using
deadly force, and the availability of alternative methods to capture or subdue the suspect.  *Id.* at
27    794.  The Court does not consider these additional factors because it finds there is conflicting
evidence as to the extent Mr. Stewart posed an immediate threat to the safety of officers or others,
28    and therefore, a genuine dispute of material fact exists.

10

1  crime was the prior assault of Mr. Turner, which had been long over at the time of the shooting.

2  (ECF No. 33 at 10.)

3      While the assault of Mr. Turner was over by the time of the shooting, it is undisputed Mr.

4  Stewart fought and struggled with Deputy Johannes on the ground.  (*See* ECF No. 33-2 at 14.)  It

5  is also undisputed Mr. Stewart grabbed Deputy Johannes's gun and they struggled for control of

6  the gun on the ground before Sergeant Pecsi shot Mr. Stewart.  (*Id.*; ECF No. 35-1 at 5.)

7  Therefore, it is undisputed Mr. Stewart "posed a danger to [Deputy Johannes] . . . such that there

8  would be a heightened interest in the use of force to subdue [Mr. Stewart]."  *Young v. Cty. of L.A.*,

9  655 F.3d 1156, 1165 (9th Cir. 2011).  Thus, this factor weighs in favor of finding the government

10  had an interest in the use of force.

11                    b.       Immediate Threat to Safety

12      Defendants argue Mr. Stewart posed an imminent threat to Deputy Johannes, Sergeant

13  Pecsi, and nearby members of the public because they could have been shot or injured as Mr.

14  Stewart tried to take Deputy Johannes's gun.  (ECF No. 32-1 at 17.)  Defendants also contend Mr.

15  Stewart was able to partially remove Deputy Johannes's gun from its holster such that Mr.

16  Stewart was able to fire the gun.  (*Id.*)  Plaintiff asserts whether Mr. Stewart was an immediate

17  threat is a factual question precluding summary judgment.  (ECF No. 33 at 11.)  Plaintiff contends

18  Sergeant Pecsi's explanation for her use of force strains credulity because she did not see Mr.

19  Stewart holding a gun and a fact finder could determine Sergeant Pecsi did not perceive Mr.

20  Stewart with a gun.  (*Id.*)

21      It is undisputed Mr. Stewart and Deputy Johannes struggled for control of Deputy

22  Johannes's gun on the ground.  (ECF No. 33-2 at 14.)  It is also undisputed Deputy Johannes

23  screamed and yelled that Mr. Stewart was taking his gun, which Sergeant Pecsi heard.  (*Id.* at 15,

24  17.)  Plaintiff also does not dispute Mr. Stewart discharged Deputy Johannes's gun, and Sergeant

25  Pecsi heard a gunshot from under Mr. Stewart and where Deputy Johannes was located.  (*Id.* at

26  17, 18.)  It is also undisputed that once Sergeant Pecsi heard the gunshot, she saw Deputy

27  Johannes begin to roll away, grab at his stomach, and act like he had been shot.  (*Id.* at 19.)

28  Moreover, Plaintiff does not dispute Deputy Johannes and Mr. Stewart were on the ground and in

1    physical contact when Sergeant Pecsi fired her gun.  (*Id.* at 20.)

2           The Court recognizes that while there were independent witnesses to the shooting,[7] this

3    case involves deadly force and thus the witness most likely to contradict the stories of Sergeant

4    Pecsi and Deputy Johannes — Mr. Stewart — is unable to testify.  *See Cruz*, 765 F.3d at 1079.

5    Thus, the Court has carefully examined all evidence in the record to determine whether the

6    testimony of Sergeant Pecsi and Deputy Johannes is both internally consistent and consistent with

7    the testimony of the independent witnesses.  *See id.*

8           While Plaintiff does not dispute Mr. Stewart discharged Deputy Johannes's gun and

9    Sergeant Pecsi heard the gunshot from where Deputy Johannes and Mr. Stewart were located, the

10   Court's review of the record indicates there is conflicting evidence concerning these material

11   facts.  Sergeant Pecsi, Deputy Johannes, and Mr. Gardner testified to hearing a gunshot before

12   Sergeant Pecsi fired her gun.  (ECF No. 32-4 at 20–21, 62–63, 110–11.)  However, both Mr.

13   Lawrence and Mr. Moreno testified they did not hear any gunshots before Sergeant Pecsi fired

14   her gun.  (ECF No. 32-4 at 152; ECF No. 33-7 at 24–25.)  Additionally, Mr. Lawrence testified

15   he was five to six feet away from Deputy Johannes and Mr. Stewart struggling on the ground

16   (ECF No. 32-4 at 148), and Mr. Moreno testified he was "maybe six feet" away from the same

17   struggle (ECF No. 33-7 at 25).  Therefore, drawing all reasonable inferences in Plaintiff's favor

18   as the Court must on summary judgment, a reasonable jury could find Mr. Lawrence and Mr.

19   Moreno would have been able to hear the first gunshot if that gunshot actually happened.  Thus, a

20   genuine dispute of material fact exists as to whether Mr. Stewart discharged Deputy Johannes's

21   gun and whether there was a first gunshot that Sergeant Pecsi could have heard before she fired

22   her gun.[8]

23   _____

24   [7]      The record includes deposition testimony from three independent witnesses that witnessed
     the shooting — Mr. Gardner, Mr. Lawrence, and Ruben Moreno.  (ECF No. 32-4 at 1–2.)
25   [8]      Defendants submit an audio recording of the CAD radio traffic from the shooting.  (ECF
     No. 32-4 at 168.)  At between 01:34–01:40 in the recording, Deputy Johannes can be heard
26   saying what sounds like "hand on my gun" before Sergeant Pecsi radios "shots fired."  (*Id.*)
     According to Defendants, Sergeant Pecsi heard the gunshot immediately after Deputy Johannes
27   yells "he has my gun," and Deputy Johannes is heard yelling something like this at approximately
     01:36 in the recording.  (ECF No. 32-2 at 11.)  However, the recording does not contain anything
28   resembling a gunshot between Deputy Johannes's statement about his gun at approximately 01:34

1      Similarly, while Plaintiff does not dispute that when Sergeant Pecsi fired her gun, Deputy

2   Johannes and Mr. Stewart were on the ground and in physical contact, the Court's review of the

3   record indicates there is conflicting evidence about this material fact.  Sergeant Pecsi, Deputy

4   Johannes, Mr. Gardner, and Mr. Lawrence testified that when Sergeant Pecsi fired her gun,

5   Deputy Johannes and Mr. Stewart were still on the ground.  (ECF No. 32-4 at 22, 63–64, 117–

6   118, 156.)  However, Mr. Moreno testified Deputy Johannes pushed Mr. Stewart down and

7   Deputy Johannes was running toward Mr. Moreno when Sergeant Pecsi fired her gun.  (ECF No.

8   33-7 at 19, 22, 26, 28–29, 32.)  Therefore, a genuine dispute of material fact exists as to whether

9   Deputy Johannes was on the ground with Mr. Stewart in physical contact when Sergeant Pecsi

10  fired her gun.  Moreover, Mr. Moreno's testimony of Deputy Johannes running before Sergeant

11  Pecsi fired her gun leads to another factual dispute as to whether Deputy Johannes was rolling on

12  the ground and grabbing at his stomach as if he had been shot before Sergeant Pecsi fired her gun.

13      The independent witnesses all testified Mr. Stewart struggled and fought with Deputy

14  Johannes in the moments before Sergeant Pecsi fired her gun.  (ECF No. 32-4 at 19, 148–50; ECF

15  No. 33-7 at 19, 21–22.)  Thus, the Court does not find there is a genuine dispute of material fact

16  as to whether Mr. Stewart posed any immediate threat to safety.  However, the Court finds there

17  is conflicting evidence about Mr. Stewart's and Deputy Johannes's actions and the events leading

18  up to the shooting.  Thus, the Court finds a genuine dispute of material fact exists as to the level

19  of immediate threat to safety that Mr. Stewart posed.

20                        c.      Resistance or Flight

21      Defendants argue Mr. Stewart resisted detention when he initially refused to show his

22  hands, reached for Deputy Johannes's gun, and fought with Deputy Johannes.  (ECF No. 32-1 at

23  17.)  Plaintiff does not address this factor.  (*See* ECF No. 33.)

24      The Court finds the undisputed evidence shows Mr. Stewart actively resisted arrest.  All

25  ─────────────────────
     and Sergeant Pecsi reporting shots fired at approximately 01:40.  (*See* ECF No. 32-4 at 168.)  The
26  Court therefore cannot rely on the audio recording to find no genuine dispute of material fact
     exists as to Sergeant Pecsi hearing a gunshot before she fired her gun. *See Scott v. Harris*, 550
27  U.S. 372, 378, 380 (2007) (noting a court cannot adopt a version of facts contradicted by the
     record where there is objective recorded evidence and no competent evidence reflects that the
28  recorded evidence was tampered with).

witnesses testified Mr. Stewart struggled with and fought Deputy Johannes.  (ECF No. 32-4 at 19, 61–62, 103, 108, 148–50; ECF No. 33-7 at 19, 21–22.)  Therefore, this factor weighs in favor of finding the government had an interest in the use of force.

<i>iii.      Balancing</i>

Defendants argue balancing the intrusion on Mr. Stewart's rights with that of the government's need for the intrusion shows Sergeant Pecsi's use of deadly force was justified.  (ECF No. 32-1 at 18–19.)  Plaintiff argues a fact finder could determine Sergeant Pecsi's use of force was unreasonable.  (ECF No. 33 at 11–12.)

The Court finds genuine disputes of material fact preclude balancing the intrusion on Mr. Stewart's rights with that of the government's need for the intrusion.  As stated, there are genuine disputes of material fact as to the level of immediate threat to safety posed by Mr. Stewart before he was shot by Sergeant Pecsi.  While it is undisputed Mr. Stewart posed some level of immediate threat to safety, "[e]ven where some force is justified, the amount actually used may be excessive."  *Glenn*, 673 F.3d at 871.  Thus, a reasonable fact finder could disagree as to whether Sergeant Pecsi used the appropriate "quantum of force" against Mr. Stewart.  *See Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010).  Based on the evidence before the Court, the Court finds there is a genuine dispute of fact as to whether Sergeant Pecsi used unreasonable force.

<i>iv.      Deputy Johannes's Participation</i>

Plaintiff argues Deputy Johannes was an integral participant in the use of unreasonable force because he yelled that Mr. Stewart "had his gun" even though Deputy Johannes "capped" his gun to keep it in the holster.  (ECF No. 33 at 12.)  Plaintiff asserts Deputy Johannes never saw Mr. Stewart with a gun and Sergeant Pecsi testified she shot Mr. Stewart because Deputy Johannes yelled that Mr. Stewart had his gun.  (*Id.*)  Defendants argue Deputy Johannes acted reasonably because Mr. Stewart was able to partially remove Deputy Johannes's gun and fire it in the holster.  (ECF No. 35 at 5–6.)  Thus, Defendants assert it was reasonable for Deputy Johannes to say Mr. Stewart "had his gun."  (*Id.* at 6.)

"An officer's liability under [§] 1983 is predicated on his 'integral participation' in the alleged violation."  *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007)

14

(quoting *Chuman v. Wright*, 76 F.3d 292, 294–95 (9th Cir. 1996)).  "[I]ntegral participation does not require that each officer's actions themselves rise to the level of a constitutional violation.  But it does require some fundamental involvement in the conduct that allegedly caused the violation."  *Id.* (internal citation omitted).  "An officer who was a 'mere bystander' or who simply was part [of] a 'team' that collectively caused the constitutional violation is not on that basis alone considered fundamentally involved."  *Est. of Lopez ex rel. Lopez v. Torres*, 105 F. Supp. 3d 1148, 1156 (S.D. Cal. 2015) (citing *Chuman*, 76 F.3d at 294–95).

Here, Deputy Johannes was more than a mere bystander or simply part of a team that collectively caused the alleged constitutional violation.  Instead, Deputy Johannes was fundamentally involved in the shooting because according to Defendants, Sergeant Pecsi seeing Mr. Stewart fight with Deputy Johannes and her hearing Deputy Johannes yell that Mr. Stewart had his gun were factors in prompting Sergeant Pecsi to fire her gun.  (*See* ECF No. 32-1 at 18); *see also Hopkins v. Bonvicino*, 573 F.3d 752, 770 (9th Cir. 2009) ("[A]n officer who does not enter an apartment, but *stands at the door, armed with his gun*, while other officers conduct the search, can . . . be a full, active participant in the search and therefore can be subject to § 1983 liability.") (emphasis in original).  As discussed, there is a triable issue as to whether Sergeant Pecsi used unreasonable force.  Therefore, because of Deputy Johannes's involvement in the shooting, the Court cannot determine as a matter of law that Deputy Johannes was not an integral participant in the alleged constitutional violation.

*v.      Qualified Immunity*

Defendants argue Sergeant Pecsi and Deputy Johannes are entitled to qualified immunity because they did not violate clearly established law.  (ECF No. 32-1 at 19.)  Plaintiff argues qualified immunity does not apply.  (ECF No. 33 at 12–13.)

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Mueller v. Auker*, 700 F.3d 1180, 1185 (9th Cir. 2012) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012)).  Qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who

1    knowingly violate the law."  *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).

2           The Court has determined the record contains sufficient evidence to raise a triable issue as

3    to whether Sergeant Pecsi's conduct constituted excessive force in violation of the Fourth

4    Amendment and whether Deputy Johannes was an integral participant in that alleged violation.

5    As such, "[s]ummary judgment in favor of . . . Defendants is improper because where there are

6    factual disputes as to the parties' conduct or motives, qualified immunity cannot be resolved at

7    summary judgment and the case must proceed to trial."  *Beech v. City of Stockton*, No. 2:15-cv-

8    00268-TLN-CDK, 2021 WL 4429455, at *7 (E.D. Cal. Sept. 27, 2021) (citing *Beaver v. City of

9    Fed. Way*, No. CV05-1938MJP, 2006 WL 3203729, at *3 (W.D. Wash. Nov. 3, 2006); *Liston v.

10   Cty. of Riverside*, 120 F.3d 965, 975 (9th Cir.1997)); *Longoria v. Pinal Cty.*, 873 F.3d 699, 711

11   (9th Cir. 2017) (holding the defendants were not entitled to qualified immunity because there was

12   a material issue of fact as to whether the officer violated the decedent's clearly established

13   constitutional right); *Espinosa v. City & Cty. of S.F.*, 598 F.3d 528, 532 (9th Cir. 2010) (affirming

14   denial of summary judgment on qualified immunity because "there are genuine issues of fact

15   regarding whether the officers violated [the decedent's] Fourth Amendment rights," and those

16   issues of fact "are also material to a proper determination of the reasonableness of the officers'

17   belief in the legality of their actions").  Accordingly, the Court cannot find Sergeant Pecsi and

18   Deputy Johannes are entitled to qualified immunity at this stage.

19          In sum, the Court DENIES Defendants' motion for summary judgment as to Plaintiff's

20   first claim for excessive force.

21                       C.       Claim Two: Denial of Medical Care

22          Defendants argue Plaintiff's second claim fails the Fourth Amendment's standard of

23   objective reasonableness that governs denial of medical care claims.  (ECF No. 32-1 at 22.)

24   Plaintiff does not address his second claim in his opposition.  (*See* ECF No. 33.)

25          On a motion for summary judgment, the plaintiff's failure to address the defendant's

26   arguments regarding a claim serves as the plaintiff abandoning that claim.  *Est. of Shapiro v.

27   United States*, 634 F.3d 1055, 1060 (9th Cir. 2011) (affirming summary judgment on a claim

28   because the plaintiff "abandoned th[e] claim by failing to raise it in opposition to the

                                                    16

1  [defendant's] motion for complete summary judgment"); *see also Shakur v. Schriro*, 514 F.3d

2  878, 892 (9th Cir.2008) (quoting *Jenkins v. Cty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir.

3  2005) ("We have previously held that a plaintiff has 'abandoned . . . claims by not raising them in

4  opposition to [the defendant's] motion for summary judgment.'").

5       Here, Plaintiff fails to address his second claim for denial of medical care in his

6  opposition.  (*See* ECF No. 33.)  Moreover, Plaintiff identifies no evidence bearing on the denial

7  of medical care to Mr. Stewart in Plaintiff's response to Defendants' separate statement of

8  undisputed facts (*see* ECF No. 33-2) or in Plaintiff's separate statement of disputed facts (*see*

9  ECF No. 33-1).  Thus, Plaintiff has provided no argument or evidence regarding his denial of

10 medical care claim and Plaintiff has abandoned this claim.

11      Accordingly, the Court GRANTS Defendants' motion for summary judgment as to

12 Plaintiff's second claim for denial of medical care.

13              D.       Claim Three: Violation of Plaintiff's Fourteenth Amendment Right to

14                       Familial Relationship

15      Defendants argue Plaintiff's third claim fails because Sergeant Pecsi and Deputy

16 Johannes's actions were objectively reasonable under the circumstances, and they are entitled to

17 qualified immunity.  (ECF No. 32-1 at 23–24.)  Plaintiff argues the same facts showing Sergeant

18 Pecsi acted unreasonably also support Plaintiff's claim that Sergeant Pecsi's conduct both shocks

19 the conscience and evinces a purpose to harm, for which she is not entitled to qualified immunity.

20 (ECF No. 33 at 15–16.)  Plaintiff also contends Sergeant Pecsi had tunnel vision, which caused

21 her to abandon basic police practices and perceive a weapon or threat that was never actually

22 there.  (*Id.* at 16.)

23 ///

24      "Under the Fourteenth Amendment, official conduct that shocks the conscience in

25 depriving [family members] of [a liberty interest in the companionship and society of a family

26 member] is cognizable as a violation of due process."  *Est. of Osuna v. Cty. of Stanislaus*, 392 F.

27 Supp. 3d 1162, 1176 (E.D. Cal. 2019) (citing *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir.

28 2010)) (alterations in original).  Thus, in the Ninth Circuit, "[t]his substantive due process claim

may be asserted by both the parents and children of a person killed by law enforcement officers." *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998).

To establish this constitutional violation, a plaintiff must show an officer's conduct "shocks the conscience." *Wilkinson*, 610 F.3d at 554. In determining whether excessive force shocks the conscience, the first inquiry is "whether the circumstances are such that actual deliberation [by the officer] is practical." *Id.* (alteration in original). "Where actual deliberation is practical, then an officer's deliberate indifference may suffice to shock the conscience." *Id.* "On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.* "[W]hen unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock [of conscience]." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998).

Because Plaintiff asserts Sergeant Pecsi's conduct evinces a purpose to harm and he does not contend there was deliberate indifference (*see* ECF No. 33 at 15–16), the Court applies the purpose to harm standard. The Court finds a reasonable jury could not find the totality of the circumstances reveals Sergeant Pecsi harbored a purpose to harm distinct from legitimate law enforcement objectives. The undisputed facts show a fast-moving sequence of events, where just six seconds passed between Deputy Johannes radioing what sounds like "hand on my gun" and Sergeant Pecsi reporting "shots fired." *See Scott*, 550 U.S. at 378, 380. "That is a paradigmatic situation where law enforcement officers are required to make a snap judgment." *Hermosillo v. Cty. of Orange*, 562 F. Supp. 3d 802, 817 (C.D. Cal. 2021).

///

Although there is conflicting evidence about whether there was a first gunshot and whether Deputy Johannes was running toward Mr. Moreno when Sergeant Pecsi fired her gun, there is no dispute Mr. Stewart had been fighting with Deputy Johannes on the ground, including grabbing Deputy Johannes's gun, in the moments before Sergeant Pecsi shot Mr. Stewart. Thus, there is no dispute Mr. Stewart posed some level of threat to safety or that Mr. Stewart actively

1    resisted Deputy Johannes before Sergeant Pecsi shot Mr. Stewart.  Moreover, Sergeant Pecsi

2    arrived at the scene in response to a call regarding an assault of an elderly man, a clearly

3    legitimate law enforcement objective, and that is when she saw Mr. Stewart fighting with Deputy

4    Johannes.  *See Hermosillo*, 562 F. Supp. 3d at 817 (noting it was a clearly legitimate law

5    enforcement objective to respond to a call regarding a domestic disturbance).  Plaintiff has not

6    presented evidence to suggest Sergeant Pecsi intentionally had a purpose to harm Mr. Stewart

7    unrelated to legitimate law enforcement objectives.  *See Porter v. Osborn*, 546 F.3d 1131, 1140

8    (9th Cir. 2008) (explaining that a purpose to harm unrelated to legitimate law enforcement

9    objectives is found where force is used against a suspect only to "teach him a lesson" or to "get

10   even").  While Plaintiff asserts Sergeant Pecsi had tunnel vision that caused her to abandon basic

11   police practices, he identifies no specific practices she abandoned.  (*See* ECF No. 33 at 16.)  The

12   Court finds the facts do not support a finding of liability on the Fourteenth Amendment claim.[9]

13        As to Deputy Johannes, the integral participant standard discussed *infra* also applies to

14   Plaintiff's third claim.  *See Keates v. Koile*, 883 F.3d 1228, 1242 (9th Cir. 2018).  Thus, because

15   Sergeant Pecsi did not violate Plaintiff's Fourteenth Amendment right to familial relationship,

16   there was no constitutional violation for Deputy Johannes to participate in.

17        Accordingly, the Court GRANTS Defendants' motion for summary judgment as to

18   Plaintiff's third claim for violation of Plaintiff's Fourteenth Amendment right to familial

19   relationship.

20                    E.      Claim Four: Municipal Liability Under *Monell*

21        Defendants argue summary judgment is appropriate on Plaintiff's fourth claim because

22   there is no evidence of a custom, policy, or practice that led to a violation of constitutional rights,

23   and there is no evidence that the Yuba County Sheriff's Office was deliberately indifferent to the

---

[9]      In many other cases, courts have found there to be a genuine dispute on an excessive force claim, but no genuine dispute as to a Fourteenth Amendment claim.  *See, e.g.*, *Est. of Casillas v. City of Fresno*, 342 F. Supp. 3d 990, 1002 (E.D. Cal. 2018) (granting summary judgment on the Fourteenth Amendment claim despite finding factual issues precluded summary judgment on the excessive force claim); *Ventura v. Rutledge*, 398 F. Supp. 3d 682, 694, 700 (E.D. Cal. 2019) (finding a reasonable jury could conclude the defendant's use of force violated the Fourth Amendment but granting summary judgment on the Fourteenth Amendment claim).

1    training needs of its deputies.  (ECF No. 32-1 at 24–25.)  Plaintiff does not address his *Monell*

2    claim in his opposition.  (*See* ECF No. 33.)  On reply, Defendants' counsel provides a declaration

3    attaching an email exchange between Plaintiff's counsel and Defendants' counsel.  (ECF No. 35-

4    3.)  In that email, Defendants' counsel asked Plaintiff's counsel if Plaintiff was dropping the

5    *Monell* claim.  (ECF No. 35-3 at 4.)  Plaintiff's counsel replied to Defendants' counsel and stated,

6    "We'll see what the Court does with it.  Didn't expressly address it."  (*Id.*)

7          On a motion for summary judgment, the plaintiff's failure to address the defendant's

8    arguments regarding a claim serves as the plaintiff abandoning that claim.  *Est. of Shapiro*, 634

9    F.3d at 1060.

10         Plaintiff fails to address his *Monell* claim in his opposition.  (*See* ECF No. 33.)  Further,

11   Plaintiff fails to identify any evidence of the County's customs, policies, or practices in Plaintiff's

12   response to Defendants' separate statement of undisputed facts (*see* ECF No. 33-2) or in Plaintiff's

13   separate statement of disputed facts (*see* ECF No. 33-1).  Moreover, Plaintiff's counsel expressly

14   noted the failure to address the *Monell* claim to Defendants' counsel and said that Plaintiff's counsel

15   would "see what the Court does with it."  (ECF No. 35-3 at 4.)  Thus, Plaintiff has provided no

16   argument or evidence regarding his *Monell* claim and Plaintiff has abandoned this claim.

17         Accordingly, the Court GRANTS Defendants' motion for summary judgment as to

18   Plaintiff's fourth claim for municipal liability under *Monell*.  Further, as no remaining claim is

19   asserted against the County, it is hereby DISMISSED from this action.

20                        F.      Claim Five: Wrongful Death-Negligence

21         Defendants argue summary judgment is appropriate on Plaintiff's fifth claim for wrongful

22   death because the undisputed material facts establish Sergeant Pecsi and Deputy Johannes did not

23   commit a wrongful act or act negligently.  (ECF No. 32-1 at 27.)  Plaintiff argues the same

24   genuine disputes of material fact precluding summary judgment on Plaintiff's excessive force

25   claim also preclude summary judgment on Plaintiff's wrongful death claim.  (ECF No. 33 at 17.)

26         "To prove negligence, 'a plaintiff must show that [the] defendant had a duty to use due

27   care, that he breached that duty, and that the breach was the proximate or legal cause of the

28   resulting injury.'"  *L.F. by & through Brown v. City of Stockton*, No. 2:17-cv-01648-KJM-DB,

1   2020 WL 4043017, at *24 (E.D. Cal. July 17, 2020) (quoting *Hayes v. Cty. of San Diego*, 57 Cal.

2   4th 622, 629 (2013)).  "[D]uty is a critical element of negligence liability."  *Hayes*, 57 Cal. 4th at

3   629.  The California Supreme Court "has long recognized that peace officers have a duty to act

4   reasonably when using deadly force."  *Id.*  To determine reasonableness, California negligence

5   law, like the Fourth Amendment's reasonableness test, requires a consideration of the totality of

6   the circumstances surrounding any use of deadly force.  *L.F.*, 2020 WL 4043017, at *24 (citing

7   *Hayes*, 57 Cal. 4th at 629).

8        As already discussed, there is a genuine dispute of fact as to whether Sergeant Pecsi used

9   unreasonable force and whether Deputy Johannes was an integral participant in that use of force.

10   This suffices to also create a genuine dispute of fact as to whether Sergeant Pecsi and Deputy

11   Johannes breached the duty of care owed to Mr. Stewart.  *See Lawrence v. City & Cty. of S.F.*,

12   258 F. Supp. 3d 977, 999 (N.D. Cal. 2017).

13        Accordingly, the Court DENIES Defendants' motion for summary judgment as to

14   Plaintiff's fifth claim for wrongful death-negligence.

15            G.      Claim Six: Violation of California Civil Code § 52.1

16        Defendants argue summary judgment is appropriate on Plaintiff's sixth claim because

17   Sergeant Pecsi and Deputy Johannes's actions were objectively reasonable.  (ECF No. 32-1 at

18   27.)  Defendants assert Plaintiff's claim requires a coercive act distinct from the shooting, and

19   Plaintiff failed to allege this distinct act.  (*Id.* at 27.)  Defendants also contend there is no evidence

20   Sergeant Pecsi or Deputy Johannes deliberately or spitefully interfered with Mr. Stewart's

21   constitutional rights.  (*Id.* at 27–28.)  Plaintiff argues his claim survives summary judgment

22   because Sergeant Pecsi's unjustified use of deadly force is a basis for liability under California

23   Civil Code § 52.1.  (ECF No. 33 at 18.)  Plaintiff contends Sergeant Pecsi recklessly departed

24   from basic police practices causing her to misperceive that Mr. Stewart was armed.  (*Id.*)

25        The Bane Act, California Civil Code § 52.1, provides a private cause of action against

26   anyone who "interferes by threat, intimidation, or coercion, or attempts to interfere by threat,

27   intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of

28   rights secured by the Constitution or laws of the United States, or of the rights secured by the

Constitution or laws of [California.]"  Cal. Civ. Code § 52.1(a).

The Bane Act "does not require the 'threat, intimidation or coercion' element of the claim to be transactionally independent from the constitutional violation alleged." *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018).  However, the Bane Act does require "a showing of the defendant's specific intent to violate the plaintiff's constitutional rights." *Rodriguez v. Cty. of L.A.*, 891 F.3d 776, 802 (9th Cir. 2018).

The specific intent inquiry for a Bane Act claim is focused on two questions:

> (1) "'[I]s the right at issue clearly delineated and plainly applicable under the circumstances of the case[;]' and [(2)] '[d]id the defendant commit the act in question with the particular purpose of depriving the citizen victim of his enjoyment of the interests protected by that right?' So long as those two requirements are met, specific intent can be shown 'even if the defendant did not in fact recognize the unlawfulness of his act' but instead acted in 'reckless disregard' of the constitutional right."

*Sandoval v. Cty. of Sonoma*, 912 F.3d 509, 520 (9th Cir. 2018) (internal citations omitted) (quoting *Cornell v. City & Cty. of S.F.*, 17 Cal. App. 5th 766, 803 (2017)).

For the reasons already discussed, there are genuine issues of material fact as to whether Sergeant Pecsi used unreasonable force and whether Deputy Johannes was an integral participant in that use of force.  Additionally, Defendants' argument that Plaintiff failed to allege a distinct act of coercion is without merit because the Bane Act requires no such distinct act.  *See Reese*, 888 F.3d at 1043.

Turning to Defendants' argument regarding the requisite showing of intent, the Court agrees with Plaintiff that a reasonable jury could find the necessary intent.  As the Court previously discussed, there is a genuine dispute as to: (1) whether Deputy Johannes was on the ground with Mr. Stewart or if Deputy Johannes was running toward Mr. Moreno when Sergeant Pecsi fired her gun; and (2) whether there was a gunshot before Sergeant Pecsi fired her gun.  Thus, a jury could determine Sergeant Pecsi and Deputy Johannes acted in "reckless disregard" of Mr. Stewart's constitutional rights due to their actions at the time of the shooting.  *See Strong v. City of Vallejo*, No. 2:18-cv-01246 WBS AC, 2020 WL 4208439, at *2 (E.D. Cal. July 22, 2020) ("[I]f plaintiff's version of the facts is accepted, a reasonable jury could find from the nature and

1   degree of the force used that [the defendant] acted with the intent to violate plaintiff's right to be

2   free from unreasonable force.").

3          As such, the Court DENIES Defendants' motion for summary judgment as to Plaintiff's

4   sixth claim under California Civil Code § 52.1.

5                      H.      Claim Seven: Battery

6          Defendants argue Plaintiff's seventh claim fails because Sergeant Pecsi's actions were

7   objectively reasonable.[10]  (ECF No. 32-1 at 28.)  Plaintiff argues the same factual questions

8   precluding summary judgment on Plaintiff's excessive force claim also preclude summary

9   judgment on Plaintiff's battery claim.  (ECF No. 33 at 17–18.)

10         42 U.S.C. § 1983 has been described as the "federal counterpart of state battery . . .

11  actions," and the standard of reasonableness is the same.  *Yount v. City of Sacramento*, 43 Cal. 4th

12  885, 902 (2008).  Therefore, a battery claim requires the plaintiff to prove the officer used

13  unreasonable force.  *Campos v. City of Merced*, 709 F. Supp. 2d 944, 963 (E.D. Cal. 2010).

14         As previously discussed, there is a genuine dispute as to whether Sergeant Pecsi used

15  unreasonable force in connection with Plaintiff's excessive force claim.  Therefore, there is also a

16  genuine dispute as to whether Sergeant Pecsi used unreasonable force in connection with

17  Plaintiff's battery claim.  *See Jaramillo v. City of San Mateo*, 76 F. Supp. 3d 905, 925 (N.D. Cal.

18  2014).

19         Accordingly, the Court DENIES Defendants' motion for summary judgment as to

20  Plaintiff's seventh claim for battery.

21         **IV.   CONCLUSION**

22         For the foregoing reasons, the Court hereby GRANTS in part and DENIES in part

23  Defendants' Motion for Summary Judgment.  (ECF No. 32.)  Defendants' motion is GRANTED

24  with respect to: (1) Plaintiff's Second Claim for Denial of Medical Care; (2) Plaintiff's Third

25  Claim for Violation of Plaintiff's Fourteenth Amendment Right to Familial Relationship; and

26

27  ---

    [10]     Defendants also contend the battery claim fails because Deputy Johannes's actions were
    objectively reasonable.  (ECF No. 32-1 at 28.)  However, the SAC only alleges the battery claim
    against Sergeant Pecsi.  (ECF No. 19 at 15.)  Therefore, the Court does not reference Deputy
28  Johannes's conduct in connection with Plaintiff's battery claim.

1   (3) Plaintiff's Fourth Claim for Municipal Liability Under *Monell*.  Defendants' motion is

2   DENIED in all other respects.  As no remaining claim is asserted against the County, the County

3   is hereby DISMISSED from this action.  The parties are ORDERED to file a Joint Status Report

4   not later than thirty (30) days of the electronic filing date of this Order indicating their readiness

5   to proceed to trial and proposing trial dates.

6       IT IS SO ORDERED.

7   **DATED:  September 29, 2022**

8

9                                 Troy L. Nunley
                                  United States District Judge